# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2010

No. 09-31048

Lyle W. Cayce
Clerk

LATISHA WILLIAMS; LAWRENCE WILLIAMS,

Plaintiffs–Appellants

v.

CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON,

Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:07-cv-04428

Before STEWART, PRADO, and ELROD, Circuit Judges.

PER CURIAM:[*]

Latisha Williams and Lawrence Williams ("the Williamses") appeal the district court's dismissal of their claims against Certain Underwriters at Lloyd's of London ("Lloyd's"). The Williamses sued Lloyd's for, *inter alia*, recovery for wind and flood damage sustained to their home as a result of Hurricane Katrina under their mortgagee's, Homecomings Financial ("Homecomings"), force-placed flood insurance policy with Lloyd's ('the Policy"). The district court dismissed the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Williamses' claims under Federal Rule of Civil Procedure 12(b)(1) with prejudice for lack of standing.

On appeal, the Williamses argue that they have standing to sue under the Policy as third-party beneficiaries. Pointing to specific terms of the Policy, the Williamses contend that the Policy creates a stipulation *pour auturi* in their favor as laid out by *Joseph v. Hospital Service District No. 2. of the Parish of St. Mary*, 2005-C-2364 (La. 10/15/06), 939 So. 2d 1206, 1211. Because the Policy does not manifest a clear intention to benefit the Williamses, we affirm the district court's dismissal of the Williamses' claims against Lloyd's.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Williamses had homeowner's insurance on their home in New Orleans (the "Property") from Fidelity National Insurance Company ("Fidelity"). The Williamses also had flood insurance on the Property, which lapsed in June 2005. As a result of the lapse, Homecomings, the mortgagee, purchased the Policy to protect its interest in the Property against flood damage. The Policy is a "force-placed" (also known as "lender-placed") policy, which insures the lender's collateral when the borrower fails to maintain a specific type of insurance. A force-placed policy allows the lender to protect its exposure on a property up to the amount of the mortgage on the date of issuance. Here, Homecomings maintains an umbrella force-placed insurance program with Lloyd's, which allows Homecomings to have force-placed coverage on many properties at the same time.

The Policy lists Homecomings as the sole insured and provides coverage up to $169,000. The Policy contains three sections that are at issue on appeal. The first section, which appears in the "Coverage" area of the Policy, reads:

### D.    TEMPORARY HOUSING EXPENSE

If **insured property** is a **dwelling** and a **flood** loss covered by this **policy** makes it unsafe or in poor condition to live in, or if a civil

2

authority will not let **owner** go to and use the **dwelling** as a result of flooding to neighboring locations, **we** cover the reasonable amount **owner** paid in renting a temporary **dwelling** that is equivalent to **owner**'s damaged **dwelling** so that **owner**'s household can maintain its normal standard of living. **We** will not apply the deductible to this coverage. This coverage is subject to the following conditions, limitations and exclusions:

1.  **We** will only pay if **dwelling** is for a single family and it is **owner**'s primary home.

2.  **We** will pay **owner** for the shortest time required to repair or replace that damaged portion of **dwelling** that made it unsafe or in poor condition to live in. If **owner** permanently relocates to a new **dwelling**, **we** will pay for the shortest time required to permanently relocate **owner**'s family to the new **dwelling**.

3.  This coverage shall continue (even if the coverage that applies to the **described location** expires after the date of loss) until the repair and/or replacement of the damaged portion of the insured **dwelling** is completed, or after **owner** has permanently relocated.

4.  **Our** limit of liability for this coverage is a maximum of $1,000 for each **flood** loss or occurrence.

The second section, which appears in the "General Conditions" area of the Policy, states:

A.  **Insurable Interest** and Limit of Liability

This **policy** provides indirect coverage to **owner**'s **insurable interest** in the **insured property** which has been pledged as security for a loan **you** have made to the **owner**. Regardless of the **insurable interests** of the **owner** or any other person or persons in the **insured property**, **you** are **our** sole **insured** under this **policy.** Even if more than one person has an **insurable interest** in the **insured property**, **we** shall not be liable for more than the amount of insurance **you** requested for each specific **described location**.

3

The third section, which appears in the "Lender-Placed Flood Insurance Deductible Buy-Back Coverage Endorsement" area of the policy, provides:

**A.    CONDITIONS**

. . . .

1.    **Insurable Interest.**  Regardless of the **insurable interest** of **Owner** or any other person or persons in the **insured property**, **you** are **our** sole insured under this **policy** and any benefits payable under this Endorsement will be made directly to **you**, for the account of the **owner**.

The Property sustained damage as a result of Hurricane Katrina and its aftermath.  At the time, the Williamses' mortgage principal balance was $142,617.80.  Homecomings submitted a flood damage claim to Lloyd's, and after an investigation by an independent adjuster, Lloyd's issued payment to Homecomings in the amount of $57,244.20.  The Williamses allegedly submitted insurance claims to Fidelity and Lloyd's and were given loss estimates that were less than the true value of the damage to their home.

The Williamses sued both Fidelity and Lloyd's, seeking, *inter alia*, recovery from Lloyd's for flood damage under the Policy.[1]  Lloyd's filed a Rule 12(b)(1) motion to dismiss for lack of standing (the "Motion").  The Williamses failed to raise the "Temporary Housing Expense" section before the district court.  The district court granted the Motion and dismissed Lloyd's from the case.  The Williamses timely appealed.

## II.  JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.  This Court reviews *de novo* a district court's Rule 12(b)(1)

---

[1] The Williamses' case against Fidelity proceeded in district court, and seems to have reached a tentative settlement. *See Williams v. Fidelity Ins. Co.*, No. 07-4428 (E.D. La. May 19, 2010) (order of dismissal).

dismissal for lack of standing.  *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009).  A motion to dismiss under Rule 12(b)(1) "should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).  This Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

## III.  DISCUSSION

To have standing to sue in federal court, a plaintiff must bring a "case or controversy."  U.S. CONST. art. III.  "This requires more than an abstract legal dispute."  *Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 566 (5th Cir. 2008) (citing *Allen v. Wright*, 468 U.S. 737, 754 (1984)).  To satisfy Article III's standing requirement, a plaintiff must allege (1) a "personal injury" that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and (3) "likely to be redressed by the requested relief."  *Allen*, 468 U.S. at 751.

A plaintiff has standing to sue under an insurance policy if the plaintiff is a named insured or an additional named insured, *see Joseph v. Hospital Service District No. 2 of the Parish of St. Mary*, 2005-C-2364 (La. 10/15/06); 939 So. 2d 1206, 1211, or if the plaintiff is an intended third-party beneficiary of the policy. LA. CIV. CODE ANN. art. 1978 ("A contracting party may stipulate a benefit for a third person called a third party beneficiary.").  It is undisputed that the Williamses are neither named insureds nor additional insureds under the Policy. At issue is only whether the Williamses are third-party beneficiaries.

Under Louisiana law, a contract for the benefit of a third party is called a "stipulation *pour autrui*."  *Paul v. La. State Emps.' Grp. Benefit Program*, 99-0897 (La. App. 1 Cir. 5/12/00), 762 So. 2d 136, 140; *see also*  BLACK'S LAW DICTIONARY 1551 (9th ed. 2009) (translating "stipulation *pour autrui*" as a

5

stipulation "for other persons"). Although article 1978 specifies that stipulations *pour autrui* may exist, "[t]he code provides no analytic framework for determining whether" one exists in any given situation. *Joseph*, 939 So. 2d at 1211.

Instead, "the code has left to the jurisprudence the obligation to develop the analysis to determine when a third party beneficiary contract exists on a case by case basis." *Id.* at 1212. When a court performs this determination, "[e]ach contract must be evaluated on its own terms and conditions in order to determine if the contract stipulates a benefit for a third person." *Id.* A court should consider "three criteria for determining whether contracting parties have provided a benefit for a third party." *Id.* These criteria are whether "1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided the third party; and 3) the benefit is not a mere incident of the contract between the promisor and the promisee." *Id.*

## A.    Waiver

The Williamses argue for the first time in their reply brief on appeal that language in the "Temporary Housing Expense" section of the Policy supports the finding of a stipulation *pour auturi* such that they have standing to sue under the Policy. The Williamses argued in their opening brief only that the "Insurable Interest and Limit of Liability" and "Conditions / Insurable Interest" sections gave them standing. Similarly, in the district court the Williamses only argued that the "Insurable Interest and Limit of Liability" and "Conditions / Insurable Interest" sections gave them standing and did not argue that the "Temporary Housing Expense" section gave them standing. In its order granting Lloyd's motion to dismiss for lack of standing, the district court did not reference the "Temporary Housing Expense" section.

"[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal." *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d

864, 877 (5th Cir. 2009) (citing *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).  Furthermore, Federal Rule of Appellate Procedure 28(a) states that an appellant's opening brief "must contain . . . the argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies . . . ."  An appellant's "[f]ailure to satisfy the requirements of Rule 28 as to a particular issue ordinarily constitutes abandonment of the issue." *United States v. Miranda*, 248 F.3d 434, 443 (5th Cir. 2001).

The Williamses "Temporary Housing Expense" argument fails to overcome either bar.  While our review is of the entire Policy, Lloyd's would be prejudiced if we entertained this eleventh-hour argument.  As this case does not involve "'substantial public interests,'" *Hatley v. Lockhart*, 990 F.2d 1070, 1073 (5th Cir. 1993) (quoting *Cont'l Ins. Cos. v. Ne. Pharm. & Chem. Co.*, 842 F.2d 977, 984 (8th Cir. 1988)), we decline to exercise our "discretion to consider issues not raised in the briefs." *Hatley*, 990 F.2d at 1073.

## B.    Stipulation *Pour Autrui*

There is no presumption of a stipulation *pour autrui*; the party claiming a stipulation *pour autrui* bears the burden of showing that one exists. *Joseph*, 939 So. 2d at 1212. "The most basic requirement of a stipulation *pour autrui* is that the contract manifests a clear intention to benefit the third party; absent such a clear manifestation, a party claiming to be a third party beneficiary cannot meet his burden of proof." *Id.*

The Williamses do not, and cannot, satisfy their burden of showing that the Policy manifests a clear intent to benefit them.  The Policy is intended to benefit one party and one party only: Homecomings.  The Policy clearly and unambiguously states, "Regardless of the insurable interests of the owner [the Williamses] . . . in the insured property, you [Homecomings] are our sole insured under this policy."  (emphases omitted).  Further, to obviate any possible

ambiguity, the Policy specifies that Homecomings is Lloyd's "sole insured under this policy" and that benefits paid will be "made directly to" Homecomings.

The Policy contains some language that, if viewed in isolation, might indicate a stipulation for the Williamses. For example, the Policy states that it "provides . . . coverage to owner's [the Williamses'] insurable interest." (emphasis omitted). This language might seem to imply that the Policy is intended to benefit the Williamses. But viewed in context, this language refers to the Williamses' insurable interest only as a means of identifying the coverage to Homecomings, with no thought of a benefit to the Williamses: "This policy provides indirect coverage to owner's insurable interest in the insured property which has been pledged as security for a loan you have made to the owner." (emphases omitted). This language specifies that the coverage is indirect (provided for Homecomings, rather than for the Williamses), and that the Policy covers the Property *qua* security for a loan provided by Homecomings. The Property itself is not important; the Property is only important in its capacity as collateral used to secure Homecomings's loan.

Likewise, the Policy says that "benefits . . . will be made . . . for the account of the owner." The Williamses rely heavily on this language, arguing that, as the "owners," it shows that the Policy explicitly contemplates a benefit to them. This interpretation, while plausible when reading selected portions of this sentence in isolation, is not viable when reading the sentence as a whole: "Regardless of the insurable interest of Owner [the Williamses] or any other person or persons in the insured property, you [Homecomings] are our [Lloyd's] sole insured under this policy and any benefits payable under this Endorsement will be made directly to you [Homecomings], for the account of the owner [the Williamses]."

The Williamses attempt to analogize to *Lee v. SafeCo Insurance Co. of America*, No. 08-1100, 2008 WL 2622997 (E.D. La. July 2, 2008). However, *Lee* is distinguishable because the policy language in *Lee* is materially different from

8

the language in the instant case. In *Lee*, AMC held a mortgage on Lee's New Orleans property. *Id.* at *1. AMC acquired an insurance policy on Lee's property from GICA. *Id.* at *3. Asserting that the property was damaged by Hurricanes Katrina and Rita, Lee submitted a claim to GICA. *Id.* at *1. After GICA refused to pay, Lee filed suit. *Id.* GICA filed a Rule 12(b)(1) motion to dismiss for lack of standing, arguing that Lee did not have an insurance contract with GICA and was not a third-party beneficiary to AMC's policy. *Id.*

AMC's policy with GICA stated, "'Amounts payable in excess of your [AMC's] interest *will be paid to the "borrower"* [Lee] unless some other person is named by the "borrower" to receive payment.'" *Id.* at *4 (emphasis supplied by district court). The district court found that "[t]his provision clearly stipulates that the portion of any loss payment exceeding the value of AMC's interest in the property will be paid directly to Lee, as the 'borrower' under the Policy." *Id.* Accordingly, the statement was "clear and unambiguous, and therefore manifest[ed] the clear intention of [AMC and GICA] to provide this benefit to" Lee. *Id.* (quotation omitted). The district court denied GICA's motion to dismiss for lack of standing. *Id.* at *1.

Unlike in *Lee*, where AMC's contract with GICA clearly envisioned a benefit to Lee—the payment of any amount in excess of AMC's interest in the property—in the instant case, the Policy does not envision a benefit to the Williamses. The Policy refers to "the account of" the Williamses not to describe a benefit to the Williamses like the one provided in *Lee*, but merely to distinguish the "Williams" account from the myriad other accounts which Homecomings has with Lloyd's.

At the time of the storm the Williamses had a principal mortgage balance of $142,617.80 and the policy limit was $169,000, so that a payment to the fullest extent of the policy limit would have resulted in $26,382.20 more than the outstanding mortgage balance. The Policy, however, does not have a provision

like the one in *Lee* that specified any excess payment would be given to Lee herself.  Even assuming that any potential additional benefit might go to the Williamses, the language in the Policy falls well below the requisite finding of a "manifestly clear stipulation" to create a stipulation *pour autrui*.

## IV.  CONCLUSION

By failing to raise the argument until their Reply brief on appeal, the Williamses waived their argument that the "Temporary Housing Expense" section gives them standing to pursue a claim under the Policy.  The Policy does not contain a stipulation *pour autrui* in the Williamses' favor because it does not manifest a clear intent to benefit the Williamses.  The district court therefore properly dismissed their claims against Lloyd's for lack of standing.

AFFIRMED.